|  |  |  |
|---|---|---|
| JUNE L. KIMMEL, Individually, and | ) | |
| as Personal Representative of the | ) | |
| ESTATE OF RICHARD KIMMEL, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | CASE NO: 2:08-CV-55-PRC |
|  | ) | |
| WESTERN RESERVE LIFE | ) | |
| ASSURANCE COMPANY OF OHIO, | ) | |
|  | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on (1) a Motion for Summary Judgment of Defendant Western Reserve Life Assurance Company of Ohio [DE 19], filed by Defendant Western Reserve Life Assurance Company of Ohio ("Western Reserve") on July 15, 2009; (2) a Cross Motion for Partial Summary Judgment [DE 26], filed by Plaintiff June L. Kimmel, Individually, and as Personal Representative of the Estate of Richard Kimmel on August 31, 2009; and (3) a Motion of Defendant, Western Reserve Life Assurance Company of Ohio, to Strike Affidavit of Newcomb [DE 33], filed by Western Reserve on September 25, 2009. All motions are fully briefed and ripe for ruling.

Finding that the conditional receipt issued by Western Reserve to Mr. Kimmel at the time he made his application for life insurance on November 13, 2006, expired on its own terms after sixty days on January 12, 2007, which was prior to Mr. Kimmel's death in an automobile accident on February 26, 2007, the Court holds that the temporary coverage of the conditional receipt expired and Western Reserve is not liable for death benefits to Mrs. Kimmel under the conditional receipt. On Mrs. Kimmel's allegations of breach of the duty of good faith and fair dealing, the Court grants summary judgment in favor of Western Reserve, finding that Indiana does not recognize a common

law duty to accept or reject an application for life insurance within a specific period of time and that

Mrs. Kimmel has not raised a genuine issue of material fact that Western Reserve had knowledge

that there was no legitimate basis for denying liability.

## PROCEDURAL BACKGROUND

Mrs. Kimmel filed a Complaint against Western Reserve in the Lake Superior Court on

January 7, 2008, alleging breach of a life insurance contract insuring her husband's life and seeking

damages in the amount of $500,000 and prejudgment and post judgment interest.  In Count I of her

Complaint, Mrs. Kimmel seeks death benefits under a conditional receipt ("Conditional Receipt"),

alleging that Western Reserve neither accepted nor rejected the application for insurance, that

Western Reserve's "delay in processing the [A]pplication was unreasonable," and that the Kimmels

would have sought and received insurance coverage from another source had the Application been

timely denied during Mr. Kimmel's lifetime.  In Count II, Mrs. Kimmel seeks death benefits under

the Conditional Receipt, alleging that Mr. Kimmel answered all questions on the Application

"truthfully, accurately and completely," that Western Reserve created pretextual reasons for denying

benefits and wrongfully accused Mr. Kimmel of failing to fully disclose his mental health status, that

Western Reserve wrongfully accused Mr. Kimmel of giving untrue and incomplete answers on his

Application, and that Western Reserve falsely claims that changes in the insurability of Mr. Kimmel

were discovered after his death, such that Mr. Kimmel was insurable as of the effective date of the

Conditional Receipt.  Finally, in Count III, Mrs. Kimmel seeks compensatory damages for a breach

of the duty of good faith and fair dealing, alleging that Western Reserve's failure to accept or deny

the application within the more than three months between the application and Mr. Kimmel's death

was an unreasonable delay and that the reasons set forth in the denial letter are pretextual and based on false allegations.

On February 19, 2008, Western Reserve filed a Notice of Removal to this Court. On March 25, 2008, Western Reserve filed an Answer to the Complaint, denying the material allegations therein and asserting affirmative defenses. Specifically, Western Reserve maintains that the terms of the Conditional Receipt were enforceable and that Mr. Kimmel's application for life insurance had expired by the express terms of the Conditional Receipt. Western Reserve further maintains that Mrs. Kimmel is not entitled to recovery because of material misrepresentations on the insurance application and that any life insurance policy for Mr. Kimmel was void ab initio, void, and/or voidable. Finally, Western Reserve denies any bad faith or undue delay.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## MOTION TO STRIKE

In response to the Motion for Summary Judgment and in support of her Cross Motion for Summary Judgment, Ms. Kimmel submits the affidavit of Richard D. Newcomb, the insurance agent who solicited and submitted Mr. Kimmel's life insurance application. In the Motion to Strike, Western Reserve asks the Court to strike the affidavit as a whole, arguing that Mrs. Kimmel holds Mr. Newcomb out as an expert witness but that she did not disclose him as an expert witness in accordance with Federal Rule of Civil Procedure 26(a)(2) or identify him as an expert in response to interrogatories. Specifically, Western Reserve objects to Mr. Newcomb's testimony as it relates

to Western Reserve's underwriting or claims handling policies and procedures, specifically in paragraphs 13, 41, and 42.

Having reviewed Mr. Newcomb's Affidavit and in light of the basis for the Court's ruling on the pending cross-motions for summary judgment, the Court finds that the opinions on these topics in these and other paragraphs offered by Mr. Newcomb in his Affidavit are not relied on by the Court and thus the motion to strike as to these statements is denied as moot. However, to the extent that Mr. Newcomb makes statements of fact based on his personal knowledge of Mr. Kimmel's application process, the advice he gave Mr. Kimmel, and his personal knowledge of Mr. Kimmel's background and medical history in giving that advice, such as in paragraphs 1-9, 11-12, 14-15, 17, 19-23, 25-37, and 40, his statements comport with Federal Rule of Evidence 701, and the Court denies the motion to strike as to those statements. The Court notes that Western Reserve does not provide any specific analysis or reasoning in support of its motion to strike as to these identified paragraphs.

Accordingly, the Court denies in part and denies as moot in part the Motion to Strike.

## MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule

56(e) establishes that the opposing party's "response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

### B. Material Facts

*1. Application for Life Insurance*

Mr. Kimmel was solicited by Richard Newcomb, a registered representative of World Financial Group, to apply for a policy of life insurance with Western Reserve. World Financial Group and Western Reserve are wholly owned subsidiaries of the same parent corporation, Aegon. At that time, Mr. Newcomb had known Mr. Kimmel socially for ten years, three of which they were also co-workers. Mr. Newcomb recommended that Mr. Kimmel apply for a preferred status policy based on what he considered to be Mr. Kimmel's excellent physical health. Mr. Newcomb was

aware that Mr. Kimmel was bipolar. Mrs. Kimmel testified that, if Mr. Newcomb had not

recommended that Mr. Kimmel apply at the preferred level, Mr. Kimmel would have applied at a

lower level.

On November 13, 2006, Mr. Kimmel submitted an application for a variable universal life

insurance policy with a face amount of $500,000.00 with Western Reserve through Mr. Newcomb.

Section 13 on page three of the application, entitled "Medical Questions," posed various specific

questions concerning the applicant's medical history and required that the applicant check either a

"yes" or "no" box for each question. The relevant questions were:

> A) For the last 180 days has the Primary Proposed Insured been actively at work, on
> a full time basis, at their usual place of business or employment?
> B) To the best of your knowledge, has any Proposed Insured within the last 10 years
> had or been told by a member of the medical profession that he or she had, or has
> been treated for:
> . . . .
> 2) Asthma, Emphysema, Chronic Bronchitis . . . or any other Respiratory disorder
> . . . ?
> 3) . . . Any thyroid or endocrine disorder?
> 4) Brain, mental, anxiety, depression, suicide attempt . . . ?"

*Id.* In response to 13A, Mr. Kimmel answered "Yes." In response to 13B, Mr. Kimmel answered

"no" to 13B(2), "no" to 13B(3), and "yes" to 13B(4).

The instructions provided: "Give the details to 'No' answers for medical questions section

13A and 'Yes' answers to question 13B-E below: Identify question number; state signs and

diagnosis of each illness or injury. List the details and results of any treatment. List the name, full

address and dates of each health care provider consulted." Def. Exh. 3-A, p. 3. Accordingly, in

Section 14, entitled "Details," Mr. Kimmel was required to disclose the date, diagnosis, treatment,

results, and duration of his "yes" response to 13B(4), to which he responded in the box available for

the answer: "09-2005, Bi-polar, medication, good, 2 yrs." *Id.* On the same line, the form asked for

the "Name, Address and Phone # of Attending Doctor and Hospital," to which he responded, using three boxes vertically, "Dr. NASR, 2814 S. Franklin" "Michigan City, IN 46360," "219-872-1500." *Id*.

Mr. and Mrs. Kimmel understood the term "attending" to mean the principal doctor supervising Mr. Kimmel's care. At the time he signed the application, Mr. Kimmel's attending physician for his bipolar condition was Dr. Nasr. The application did not ask any questions regarding anger issues or incidents or any treatment for anger. The application did not ask for a description of alcohol consumption.

Under Section 13C, the form asked:

> To the best of your knowledge, has any Proposed Insured within the last 10 years:
> . . . .
> 2) Sought or been advised to seek treatment, limit or discontinue use of alcohol?
> 3) Been on or are now on prescribed medication . . . ?
> 4) Had or been advised to have any hospitalization, surgery, or any diagnostic tests including, but not limited to, electrocardiograms, blood studies, scans, MRI's or other test?
> 5) Had an examination, treatment or consultation with a doctor or health care provider other than above?

*Id*. Mr. Kimmel checked "No" in response to 13C(2), (4), and (5) and checked "Yes" in response to 13C(3). Details were again requested in Section 14, and Mr. Kimmel responded "09-2005, Bipolar, medication: Lithium 900 mg, Lamictal 300 m, Provigil 200 mg; duration on meds = 1 year; results: good." *Id*.

The last page of the application, which is also the signature page, contains a single section, "Section 23. Acknowledgment of Applicant and Proposed Insured," which begins with the phrase: "Each of the undersigned hereby certifies and represents as follows." The third and last paragraph of the section provides:

> The Company shall have sixty days from the date hereof within which to consider and act on this application and if within such period a policy has not been received by the applicant or if notice of approval or rejection has not been given, then this application shall be deemed to have been declined by the Company.

*Id*. at p. 5. Mr. Kimmel signed this page after the acknowledgment: "I understand that any omissions or misstatements in this application could cause an otherwise valid claim to be denied under any insurance issued from this application." *Id*.

As part of the application, Mr. Kimmel made an initial payment of $385.00. Section 10 of the Application, entitled "Premiums Payable," did not include a dollar amount for the "Initial Planned Premium" but did indicate that a monthly electronic bank draft would be made on the 16th of each month. Other than the initial payment, Mr. Kimmel never paid, nor anyone on his behalf paid, any additional monies to Western Reserve. There is no evidence that Mr. Kimmel was asked to pay any additional amounts.

At the time he submitted his application, Mr. Kimmel received a "Conditional Receipt," which contained the following material terms:

> The policy you applied for will not become effective unless and until a policy contract is delivered to you and all other conditions of coverage are met . . . .
> . . . .
> Any conditional coverage provided by this Receipt will terminate on the earliest of: (a) 60 days from the date the application was signed; (b) the date the Company either mails notice to the applicant of the rejection of the application and/or mails a refund of any amounts paid with the application; (c) when the insurance applied for goes into effect under the terms of the policy applied for; or (d) the date the Company offers to provide insurance on terms that differ from the insurance for which you have applied.
> . . . .
> If one or more of this Receipt's conditions have not been met exactly, . . . the Company will not be liable except to return any payment made with the application. If the Company does not approve and accept the application for insurance within 60 days of the date you signed the application, the application will be deemed to be rejected by the Company and there will be no conditional insurance coverage. In

that case, the Company's liability will be limited to returning any payment(s) you have made upon return of this Receipt to the Company.

. . . . This Receipt does not provide any conditional insurance until all of the conditions and requirements are met as outlined above.

Def. Br., Exh. 3-B. The Conditional Receipt also provided that the "Conditional Insurance will take effect as of the Effective Date, so long as all of the following requirements are met: 1. Each person . . . is found to have been insurable . . . ; 2. As of the Effective Date, all statements and answers given in the application must be true; . . . ." *Id.* The Conditional Receipt was signed on November 13, 2006; sixty days thereafter was January 12, 2007.

On November 20, 2006, Western Reserve received a copy of Mr. Kimmel's Application. Western Reserve then reviewed the information contained on the Application as part of the underwriting process. On November 27, 2006, Western Reserve advised Mr. Newcomb that the following specific information or tests were needed: (1) SMA blood test, (2) home office specimen, (3) vital signs, and (4) motor vehicle reports.

Based upon the information disclosed in the application, Western Reserve sought to obtain Mr. Kimmel's medical records from the provider disclosed on his application–Dr. Nasr. To that end, on December 8, 2006, Western Reserve requested that Examination Management Services, Inc. ("EMSI") send Mr. Kimmel's authorization directly to Dr. Nasr in order to obtain Mr. Kimmel's treatment records, and EMSI faxed Mr. Kimmel's medical authorization to Dr. Sujayl Nasr's office that same day. Jennifer Keller[1] testified by affidavit based on personal knowledge that at or about the time EMSI requested the medical records, EMSI was informed that there was a $20.55 administrative fee for the cost of copying these records and that the records would be sent to them

---

[1] The Affidavit does not identify Ms. Keller or set forth her connection to Dr. Nasr's office, although she does refer to Dr. Nasr's office as "our office." Pl. Br., Exh. 3, ¶ 7.

after payment of the fee.  Mr. Newcomb has no recollection of ever being advised of any problem securing Mr. Kimmel's records because of a failure to pay an administrative fee for the records.

On December 20, 2006, Western Reserve learned that Dr. Nasr would not release Mr. Kimmel's records until Mr. Kimmel signed a HIPPA-compliant authorization at Dr. Nasr's office. Ms. Keller testified that when no such authorization was received from Western Reserve, Dr. Nasr's office contacted the Kimmels and asked them to come to the office to sign the authorization.  Mr. Kimmel signed the authorization to release his records at the office on December 22, 2006.  At no time did anyone inform Mr. or Mrs. Kimmel that there was any impediment to securing his records other than the HIPPA authorization.

On January 22, 2007, Western Reserve instructed EMSI to close its file.

In January 2007, Mr. Newcomb spoke with Mrs. Kimmel who told him that she had been contacted about a personal history and that she had provided a personal history on January 23, 2007.

On February 26, 2007, Mr. Kimmel died in a car accident.  Mr. Newcomb was notified of the death, and he immediately notified Western Reserve's claim department.  Mr. Newcomb learned that Western Reserve had not secured Dr. Nasr's records.

On February 27, 2007, Mr. Newcomb contacted Dr. Nasr's office and spoke with Ms. Keller, who informed him that the records had not been released because the administrative fee had not been paid.  That same day, Ms. Keller sent the records by priority mail without payment of the administrative fee out of sympathy for Mrs. Kimmel.

On March 1, 2007, EMSI received a copy of Dr. Nasr's records which were then sent by EMSI to, and received by, Western Reserve on March 2, 2007.

Mr. Lovejoy testified that neither EMSI nor Western Reserve were requested to pay for, or did they pay for, Dr. Nasr's medical records.

In his affidavit, Mr. Lovejoy testified that the "decision to accept or reject an application may take several months, depending on when information is received and the contents of the information received." Def. Br., Exh. 3, ¶ 17.

At the time of Mr. Kimmel's death, Western Reserve had not yet received Dr. Nasr's medical records. At no time prior to Mr. Kimmel's death did Western Reserve issue any life insurance policy to Mr. Kimmel.

*2. Mr. Kimmel's Relevant Medical History*

Western Reserve highlights the following areas of Mr. Kimmel's medical history as material.

Mr. Kimmel began treating with Dr. Nasr on July 7, 2005. In an "alcohol and drug history," Mr. Kimmel indicated that he reported using alcohol to excess on several occasions and that he uses alcohol once a week. Dr. Nasr's records contained other information Mr. Kimmel did not include on his application: Mr. Kimmel had been referred to Dr. Nasr by his family physician who was having a hard time managing Mr. Kimmel's bipolar disorder; that Mr. Kimmel had abused alcohol but had stopped since the first visit with Dr. Nasr on July 7, 2005; on July 28, 2005, Mr. Kimmel reported "excessive sleepiness & almost hit someone today if it were not for wife calling," that his primary problems are fatigue, poor concentration, and anxiety, that he had tried seven different medications, that he consumed six-twelve beers a night; on July 28, 2005, Dr. Nasr diagnosed Mr. Kimmel with bipolar disorder and narcolepsy; on August 3, 2005, Mr. Kimmel was "falling asleep while driving;" on September 28, 2005, Mrs. Kimmel reported that Mr. Kimmel's anxiety was "real bad;" on October 6, 2005, Dr. Nasr noted that Mr. Kimmel had a "poor response to medication;" on

a Carroll Rating Scale Questionnaire Mr. Kimmel noted that he often wished he were dead; on November 7, 2005, Dr. Nasr admitted Mr. Kimmel to St. Anthony Hospital with a diagnosis of bipolar disorder and depression as "severe" and narcolepsy and noted that Mr. Kimmel had presented at his office that day and that he was beginning to have suicidal ideas and plans and that he has had problems with falling asleep while driving; Mr. Kimmel underwent sleep studies that showed he suffered from narcolepsy; Mr. Kimmel underwent individual and group therapy; Mr. Kimmel had various anger issues; Mr. Kimmel was hospitalized in the Behavioral Medicine Unit at St. Anthony Hospital from November 7, 2005, through November 11, 2005; on February 6, 2006, Dr. Nasr described Mr. Kimmel's condition as "three years of unremitting illness under other physicians' care;" on October 4, 2006, Mr. Kimmel reported, "I need a statement I'm being treated here and 'under control;'" and on October 23, 2006, Dr. Nasr noted, "We've had a setback the past 2 months. 'Very hot temper.'"  Def. Br., Exh. 3-C.

The records from Dr. Nasr identify medications that Mr. Kimmel had been taking that were not listed on his Application, including Symbyex, Depekote, Effexor, Abilify, Requip, Rozerem, Visaren, Triavil, Seroquel, Geodon, Gabritral, and Focalin.

During his treatment with Dr. Nasr, Mr. Kimmel underwent a Cerebral Perfusion SPECT Imaging Study at the University of Illinois at Chicago, which was performed on October 17, 2005, due to Mr. Kimmel's clinical history of attention deficit disorder and possible bipolar disease.  The results of the test were abnormal.

During the ten years prior to his Application, Mr. Kimmel had taken various medications for depression including Zoloft, Paxil, Prozac, Celexa, Buspar, Wellbutrin, Effexor, and Sympyax.  As of December 31, 2004, Mr. Kimmel was prescribed and took at some point Lamictal, Lithium,

Provigil, Risperdal, Trazodone, Promethazine syrup, Geodon, Seroquel, Provigil, Wal-itin, Omnicef, Mirtazapine, Ambien, Clonazepam, Hydrocortisone, Levaquin, Nasonex, Gabitril, Alprazolam, Fluticasone, Focalin, Adderall, Kie syrup, Avelox, Hyoscyamine, Prednisone, Duratuss, Abilify, Perphenazine/Amitriptyline, Ultracet, Effexor, Biaxin, Benzonatate, Guaifenex, Zithromax, Nasacort, Depakote, Symbyax, Sonata, Allegra, Rhinocort, Respaire, Cefaclor, Tramadol, Augmentin, Tequin, Methylprednisolone, Vigamox, Metronidazole, and Cipro.

In December 2005, Dr. Nasr imposed permanent work restrictions for Mr. Kimmel as a result of his bipolar illness and the medication he was taking as a result of the condition.

In the months preceding his Application, Mr. Kimmel suffered vision problems and sought treatment on November 1, 2006, and on November 9, 2006. On November 9, 2006, Dr. Bejec referred Mr. Kimmel to Dr. Purvin, a neuro-ophthalmologist; Mr. Kimmel's November 17, 2006 appointment with Dr. Purvin was scheduled prior to November 13, 2006.

*3. Western Reserve's Rejection of Mr. Kimmel's Application*

After Mr. Kimmel died on February 26, 2007, Mrs. Kimmel submitted a claim for death benefits to Western Reserve. At the time of his death, Western Reserve had not accepted or denied Mr. Kimmel's Application nor issued any life insurance policy to Mr. Kimmel. Ms. Chillura, a Claims Manager for Western Reserve, testified that when an insured or applicant dies within two years of the date of the Conditional Receipt or policy issuance date, Western Reserve conducts a contestable investigation. The two year period is commonly referred to as the "contestability period." Since Mr. Kimmel died within two years of his Application, the Claims Department of Western Reserve conducted its usual standard investigation.

On March 7, 2007, Western Reserve hired Broyles Claims Decision Support, Inc. ("Broyles") to assist in the investigation of Kimmel's contestable death claim. Through its investigation, Broyles sought and obtained Mr. Kimmel's records and information from many locations, including but not limited to Dr. Keith Gingrich, Dr. Richard Rubinstein, LaPorte County Sheriff, St. Anthony Memorial Hospital, Dr. Nasr, Bennett Nott, Walgreens, Dr. Chiedu Nchekwube, Anthem BCBS, Methodist Hospital, Dr. Berming, Porter Memorial Hospital, Mrs. Kimmel, NIPSCO/NiSource, and the Indiana Department of Motor Vehicles. The investigation revealed that Mr. Kimmel also treated with Dr. Melnik, Dr. Blumenthal, Dr. Riggle, and Dr. Purvin, but Broyles did not obtain records from these physicians. Broyles completed its investigation on June 12, 2007, and forwarded copies of all documents it had received to Western Reserve.

Ms. Chillura testified that from Broyles' investigation, Western Reserved learned that Mr. Kimmel did not disclose prescription medications, treating health care providers, medical conditions, diagnostic testing, the duration and extent of his psychiatric condition, the number of treating physicians for the psychiatric condition, and the nature and extent of his medical treating in the ten years preceding his Application. She further testified that, given the amount of information learned and obtained by Broyles, it was not unusual for the "contestable claim investigation" to take several months. She further testified that, once the Claims Department obtained and reviewed the materials from Broyles, the Claims Department forwarded all the materials to Underwriting and requested that Underwriting determine whether Mr. Kimmel would have been issued a policy had he disclosed the requested information that was not listed on the Application but discovered by Broyles.

Ms. Chillura testified that the investigation into whether to accept or reject Mrs. Kimmel's claim for death benefits for her husband was done in accordance with Western Reserve's policies

and procedures for claims submitted where a proposed insured dies within two years from the date on the Conditional Receipt. She further testified that all of Western Reserve's actions were undertaken in good faith and with Western Reserve's standard protocol for a situation in which the proposed insured dies within two years of the date on the Conditional Receipt.

Western Reserve's underwriting requirements discuss the handling of conditional receipt claims, in part, as follows: "If a premium payment is tendered simultaneously with the submission of the Application, a conditional receipt is given, and if death should occur prior to the issuance of the policy, the file should be referred to Risk Management." Pl. Br., Exh. 5, p. 963. The requirements further provided that, when the insured died during the application process and there was a rider on the policy, the underwriting should stop and "Claims will set up their claim file and start the usual inquiries. [Notify the] Case Coordinator not to send the usual drop letter." *Id*. at 964.

Based on the information obtained through the contestable investigation and after consultation with the Underwriting and Legal departments, Western Reserve denied Mrs. Kimmel's claim for death benefits, concluding that Mr. Kimmel's Application contained material misrepresentations and omissions that were relevant and material to the risk Western Reserve was asked to assume. Mr. Lovejoy avers in his affidavit that such information would have been considered by underwriting in determining whether Mr. Kimmel was or would be insurable. Mr. Lovejoy further states that, if Western Reserve had been advised of the severity of Mr. Kimmel's medical history and complications, coverage would not have been approved on any basis and that he was not insurable with Western Reserve. For example, the additional information revealed that in the ten years prior to his Application, Mr. Kimmel had treated with the following providers and or institutions that he did not list on his Application: Dr. Keith Gingerich (1/30/97-12/2/04); Porter

Memorial Hospital (5/4/97-9/29/06); Quest Diagnostics (10/97); Dr. Kenneth Blumenthal (12/6/99-12/16/02); Dr. Pam Berming (5/5/03-1/26/06); Dr. Melnik (1/20/04-2/17/04); Dr. Chiddu Nchekwube (1/13/05-11/10/06); St. Mary Medical Center (12/13/99); Methodist Hospital Sleep Disorder Centers (4/05); Dr. Richard Rubinstein (6/8/05-6/20/05); St. Anthony Hospital (11/7/05-11/11/05); University of Illinois at Chicago (10/05); Daniel Dewar, Chiropractor (6/06-10/31/06); Dr. Blackman, Doctor of Optometry (11/1/06); Dr. Bejec, Ophthalmologist (11/9/06, 11/10/06).

Western Reserve learned that Mr. Kimmel had been treating for depression as early as 1996 with Dr. Gingerich; had been diagnosed with long standing sinus issues; had been diagnosed with attention deficit disorder; had vision issues, including bilateral vision loss, fatigue, and polyarthralgia in September 2006; had been diagnosed with potential upper airway resistance syndrome and potential idiopathic hypersomnia in 2005; had been diagnosed with mood disorder, insomnia, and excessive sleepiness in June 2005; used and/or was prescribed a CPAP machine to treat some of his sleep issues; and had been treated for pain in his hips, right leg, upper back, shoulders, and lower back in October 2006. Western Reserve also learned of various diagnostic testing that had not been disclosed including, allergy testing in 1997, DT of his sinuses in 1998, CT of his paranasal sinus in 12/99, x-rays of his mandible, c-spine, and chest in 9/01, x-ray of his mandible in 11/01, x-ray of his mandible in 1/02, a tomogram in 2/02, a tomography of his paranasal sinuses in 1/04, blood work which showed high cholesterol and high lipid count in 1/05, neuroscientific testing which showed his epinephrine, norepinephrine, dopamine, and serotonin was low in 1/05, sleep studies and polysomnogram in 4/05, MRI of his right shoulder in 6/05, a hearing test which showed hearing loss in both ears in 8/05, blood work which showed high lipid count in

7/06, trigger point injections, occipital nerve block, myer's cocktail as nutrient therapy in 8/06, and a thyroid test in 9/06.

On July 23, 2007, Western Reserve sent Mrs. Kimmel a letter denying death benefits and setting forth the reasons therefore. After reviewing some of the application questions and Mr. Kimmel's responses as well as section 23 of the Application, the letter provided:

> If [Western Reserve] had been advised of the severity of Richard Kimmel's medical history and complications, coverage would not have been approved on any basis. Failure to answer the questions in the Application completely and correctly, by not providing true information, constitutes misrepresentation material to the risk that Western Reserve Life was asked to assume."
> . . . .
> Western Reserve Life reserves any rights and defenses that it has or may have with regard to a claim under this application.

Def. Br., Exh. 4-A, p. 3. Western Reserve also returned the premium payment and interest for a total of $390.08.

There is no evidence of record that Mrs. Kimmel attempted to apply for life insurance with any company other than Western Reserve at any time after Mr. Kimmel submitted his Application to Western Reserve.

*4. Western Reserve's Expert Testimony*

Western Reserve offers the expert opinion of Dr. John Fitzgerald, a Professor of Finance and Insurance at Ball State University, holding a Ph.D. in Risk and Insurance from the University of Wisconsin. Dr. Fitzgerald has forty-five years of experience in insurance matters, including his educational background, training, and his insurance practice. He has taught, performed research, and published materials on life insurance and conditional receipts. He is a Certified Insurance Counselor and has passed the National Examination for Life & Health Insurance. Based on his review of this case and on his education, experience, and training, Dr. Fitzgerald offered an opinion,

which is summarized as follows. Western Reserve did not unreasonably withhold life insurance policy benefits without proper cause, and Western Reserve had a rational basis for denying Mr. Kimmel's death claim. Mr. Kimmel made several material misrepresentations on the signed Application, and Mr. Kimmel concealed material medical facts from Western Reserve when he signed his life insurance application. Mr. Kimmel did not provide accurate information to Western Reserve when the Application was signed by him on November 13, 2006. Western Reserve was justified in seeking additional medical information both between the date of the Application and the date of the automobile accident and following Mr. Kimmel's death prior to denying coverage. There was no unreasonable delay in deciding whether to issue a life insurance policy on Mr. Kimmel's life. Western Reserve conducted a reasonable investigation based upon the information provided during the underwriting process.

Dr. Fitzgerald further opined that the Conditional Receipt issued on November 13, 2006, contains terms and deadlines that are reasonable and consistent with generally accepted life insurance industry practices. Western Reserve acted in a reasonable manner in underwriting Mr. Kimmel's Application for life insurance and their underwriting process was reasonable. Western Reserve did not exhibit any dishonest purpose, moral obliquity, furtive design, or ill will in handling Mrs. Kimmel's claim. Western Reserve did not deceive the Kimmels nor did it exhibit any willful and wanton disregard for the Kimmel's rights. Additionally, Western Reserve did not exhibit any malice, fraud, gross negligence, oppressiveness, or egregious conduct. Dr. Fitzgerald opined that Mr. Kimmel would not have obtained life insurance from any other company because he was uninsurable given his extensive medical background, history, and the extent of his current medical conditions.

*5. Dr. Nasr's Testimony*

Dr. Nasr testified that he began treating Mr. Kimmel in July 2005 and that previously, Mr. Kimmel had been incorrectly treated for depression with antidepressants rather than for his moderate bipolar illness. Dr. Nasr testified that he had explained to Mr. Kimmel that his depression was not an independent illness but rather a phase of his bipolar condition. He explained that treatment with antidepressants without mood stabilizers exacerbated his bipolar illness and his feelings of anger and irritability. He testified that, once a patient is diagnosed with bipolar illness, depression is not treated as a separate issue but rather as a phase of the bipolar illness. Dr. Nasr testified that neither Mr. Kimmel's anger nor his bipolar illness made him a threat to himself or others, that he was not a dangerous person, and that he was not suicidal.

Dr. Nasr testified that, prior to first seeing Dr. Nasr, Mr. Kimmel, as is common with bipolar patients, had increased his consumption of alcohol to self-regulate his bipolar illness, but since then had decreased his drinking to his previous social use prior to treatment. He testified that alcohol should not be used to regulate bipolar symptoms or phases and that this is a form of alcohol abuse, which he had explained to Mr. Kimmel. Dr. Nasr testified that he did not diagnose Mr. Kimmel as alcohol dependent and that there were no signs of withdrawal. He testified that Mr. Kimmel was temporarily taken off work on Dr. Nasr's recommendation because he was fatigued and needed to be at full strength to adjust the medications that would best treat his bipolar illness. Dr. Nasr concluded that Mr. Kimmel could and did work full time despite his bipolar illness. He testified that Mr. Kimmel had no underlying personality disorder and was a compliant patient. He testified that Mr. Kimmel's prognosis factors were good and that he was highly motivated to treat his condition because of his family support and his job.

Dr. Nasr testified that the hospitalization in November 2005 was principally to provide for regulation of Mr. Kimmel's medication. He clarified that on September 29, 2006, Mr. Kimmel was not hospitalized for bipolar illness but rather for tests. He clarified that the July 28, 2005 statement that Mr. Kimmel had "almost hit someone today" was an account of a near auto accident due to sleepiness and not to anger. Dr. Nasr reviewed Dr. Fitzgerald's statement that Dr. Nasr had diagnosed "road rage," and testified that the record relied on does not show a diagnosis of "road rage," that there is no such diagnosis in psychiatric nomenclature, and that Dr. Nasr never gave such a diagnosis to Mr. Kimmel.

Dr. Nasr testified that on August 30, 2006, Mrs. Kimmel noted "tremendous improvement" by Mr. Kimmel as a result of his treatment. Dr. Nasr explained the October 23, 2006 treatment note that Mr. Kimmel had a "very hot temper" as documentation of Mr. Kimmel's perfectionist nature and his expression of frustration that his symptoms were not perfectly controlled.

Dr. Nasr opined that Dr. Fitzgerald "cherry picked" selected portions of Mr. Kimmel's medical records in a way that distorts his care and the severity of his conditions, including identifying conditions such as diarrhea, vomiting, and sinusitis, which have no relationship to his bipolar illness; depression, which is a phase of bipolar illness; anger, which was a symptom of his bipolar illness; and alcohol abuse in the form of using alcohol to self medicate bipolar phases and symptoms. Dr. Nasr also clarified Mr. Kimmel's 18 days of "hospitalization" from 1996 and 2007, explaining that 11 of 18 involve only three hospitalizations, one each for gastroenterocolitis, jaw fracture, and onset of treatment for bipolar. He further disputes Dr. Fitzgerald's reliance on Mr. Kimmel's chiropractic treatments and treatment for sinusitis as unrelated to bipolar illness or any phase thereof.

Finally, Dr. Nasr comments that, although Dr. Fitzgerald noted Mr. Kimmel's notation on November 11, 2005, in the Carroll rating scale that he often wishes he were dead, Dr. Fitzgerald omitted the fact that Mr. Kimmel had no such thoughts in twenty other rating scales.

## C. Analysis

In her Complaint, Mrs. Kimmel seeks recovery of death benefits from Western Reserve under the Conditional Receipt in the amount of $500,000 following the death of her husband and seeks compensatory damages for Western Reserve's alleged breach of the duty of good faith and fair dealing. The Court considers each of Mrs. Kimmel's claims in turn.

At the time Mr. Kimmel signed his Application for life insurance benefits with Western Reserve on November 13, 2006, he also received a Conditional Receipt, which provided temporary coverage under certain conditions during the application review process. As no policy of life insurance was issued prior to Mr. Kimmel's death, the death benefits sought by Mrs. Kimmel would be payable under the Conditional Receipt, if at all. The Conditional Receipt is subject to the same rules of construction as any ordinary contract of insurance. *See Hornaday v. Sun Life Ins. Co. of Am.*, 597 F.2d 90, 92 (7th Cir. 1979). Insurance contracts, like all contracts, are interpreted with the goal of determining and enforcing the parties' intent as revealed by the contract. *Westfield Cos. v. Knapp*, 804 N.E.2d 1270, 1274 (Ind. Ct. App. 2004), *trans. denied*. The Court construes the contract as a whole, and if the language is clear and unambiguous, the contract is given its plain and ordinary meaning. *Id.*; *see also Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997). "Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence." *Id.* The Court, construing an insurance contract, "ultimately must give effect to the intent and

reasonable expectations of the parties as expressed in the contract," and the Court's power does not extend to changing the contract terms. *Guzorek*, 690 N.E.2d at 669.

Concerning binders in conditional receipts issued at the time of an application for life insurance, Indiana courts have held:

> Where . . . a receipt is issued by a life insurer and the receipt is supported by consideration, a contract is created. Any conditions contained in the receipt are to be treated as conditions *subsequent* thereby compelling an insurer to act affirmatively or negatively on the application. Moreover, where an applicant is not acceptable, he must be notified and the premium returned. An insurer cannot terminate the risk so assumed unless the applicant is so notified in his lifetime.

*Monumental Life Ins. Co. v. Hakey*, 354 N.E.2d 333, 334 (Ind. App. 1976) (internal quotation marks and alterations omitted) (emphasis added) (quoting *Kaiser v. Nat'l Farmers Union Life Ins. Co.*, 339 N.E.2d 599, 627 (Ind. App. 1976) (setting forth extensive analysis of policy reasons for adopting this interpretation)). Nevertheless, any material misrepresentation on the life insurance application operates as a condition *precedent* to coverage if the express terms of the receipt so provide, rendering the coverage void. *Primerica Life Ins. Co. v. Skinner*, 678 N.E.2d 1140, 1142-43 (Ind. Ct. App. 1997) (addressing the confluence of the holding in *Kaiser* and the existing rule that material misrepresentations on a life insurance application render coverage void) (quoting *Curtis v. Am. Cmty. Mut. Ins. Co.*, 610 N.E.2d 871, 874 (Ind. Ct. App. 1993) ("False representations concerning a material fact, which mislead, will void an insurance contract . . . regardless of whether the misrepresentation was innocently made or made with a fraudulent intent.")).

Underlying the holding in *Kaiser* and *Monumental* is the public policy rejection of an insurer that accepts a premium with the application and then unreasonably rejects an application after the applicant dies and denies coverage under the conditional receipt, thus having collected a premium for a period that it did not actually provide coverage or bear any risk. *Kaiser*, 339 N.E.2d at 627.

In *Meding v. Prudential Ins. Co. of Am.*, in which the applicant for life insurance died prior to the expiration of the conditional receipt and the insurer had not denied the application and refunded the premium, this Court found that the insurer could not deny coverage, citing *Kaiser* for the "strong public policy in Indiana which prohibits insurers from accepting premiums and then conditioning the receipts to prevent the insurer from incurring any risk during the period which it retains an applicant's premium, and during which an applicant might have reason to believe he was insured." 444 F. Supp. 634, (N.D. Ind. 1978).

Moving for summary judgment in its favor on the claim for death benefits, Western Reserve argues that no coverage existed under the Conditional Receipt when Mr. Kimmel died because the receipt expired on its own terms sixty days after the date of the Application and prior to Mr. Kimmel's death, or, in the alternative, because the Conditional Receipt was either void, void *ab initio*, or voidable because of material misrepresentations made by Mr. Kimmel on his Application. In her Cross Motion for Summary Judgment, Mrs. Kimmel contends that the Conditional Receipt was still in effect at the time of Mr. Kimmel's death because Western Reserve had not yet denied his Application and refunded the premium and because Mr. Kimmel made no material misrepresentations on the Application.

*Kaiser* and *Monumental* are the seminal Indiana cases establishing that an insurer is liable for coverage under a conditional receipt if it did not deny the application and return the premium prior to the applicant's death and that conditions in the receipt, with the exception of material misrepresentations, are conditions subsequent to coverage. As with the applicants in *Kaiser* and *Monumental*, Mr. Kimmel died before the insurer, Western Reserve, denied his Application and refunded the premium. However, in contrast with those cases, which dealt with the death of an

applicant during the effective period of the conditional receipt, Mr. Kimmel died after the sixty-day expiration of his Conditional Receipt. Unlike in *Kaiser* and *Monumental*, Western Reserve was not trying to terminate a conditional receipt prior to its natural expiration, and the policies at play in *Kaiser* and *Monumental* are not implicated here.

Faced with an applicant who died after the expiration of a conditional receipt, like Mr. Kimmel in this case, the Seventh Circuit in *Hornaday v. Sun Life Insurance Co.*, found that, under Indiana law, a conditional receipt may expire on its own terms, precluding recovery of death benefits. 597 F.2d at 94. In *Hornaday*, the court distinguished *Kaiser* and *Monumental* as cases that established the "requirements to terminate a conditional receipt *prior* to its natural expiration," from an earlier case, *Barr v. The Insurance Co. of N. Am.*, 61 Ind. 488 (1878), in which the Indiana Supreme Court found that a conditional receipt expired on its own terms. *Hornaday*, 597 F.2d at 92-93 (emphasis added). In *Barr*, the conditional receipt expressly provided that it was for a term of thirty days from the date of the insurance application, and the Indiana Supreme Court held that the insurance company was not liable as "[t]he written contract of assurance expired by its own limitation, before the loss occurred . . . ." 61 Ind. at 493. The court noted that neither *Kaiser* nor *Monumental* addressed the findings or holding in *Barr*, and, thus, *Barr* remains good law. *See Hornaday*, 597 F.2d at 93.

The plain language of the Conditional Receipt at issue in this case provides for both the termination of coverage under the receipt and denial of the application if no action is taken by Western Reserve within sixty days of the application. The Conditional Receipt provides that any conditional coverage would terminate on the earliest of "60 days from the date the application was signed," the date the application was rejected and the premium refunded, the date the insurance went

into effect as applied for, or the date an offer for insurance on terms different than applied for was made.   In this case, Western Reserve neither accepted or denied the coverage sought in Mr. Kimmel's Application or offered different coverage prior to the expiration of the sixty days; thus, the earliest event triggering termination of coverage was the expiration of the sixty days.   The Conditional Receipt also provides that, if there is no acceptance or denial within sixty days, the application for life insurance "will be deemed to be rejected . . . and there will be no conditional insurance coverage."   Similarly, page 5 of the Application itself states that, if within sixty days a policy had not been received by Mr. Kimmel or if notice of approval or rejection had not been given, then the Application would be deemed to have been declined by Western Reserve.   Mr. Kimmel signed the Application on November 13, 2006, and sixty days thereafter was January 12, 2007.

Although Mrs. Kimmel alleges that Western Reserve "neither accepted nor rejected the application for insurance," the express language of the Conditional Receipt provides that the application is in fact "deemed rejected" upon the expiration of the sixty days without other action by the insurer.   Despite Mr. Kimmel's inferior bargaining power in relation to Western Reserve regarding the terms contained in the Application and the Conditional Receipt, the terms "will terminate" and "deemed to be rejected" are unambiguous and obvious to an ordinary applicant of average intelligence, and Mr. Kimmel should have had no expectation of coverage after January 12, 2007, as a result of those express terms.   The termination condition "was not a hidden phrase filled with legal technicalities buried within the small print of the contract."   *Hornaday*, 597 F.2d at 94. Nor is the provision a "device calculated to deceive" given its clear terms and explanation on the face of the contract. *See W. & S. Life Ins. Co. v. Vale*, 12 N.E.2d 350, 354 (Ind. 1938) (considering, pre-*Kaiser*, the effect of an insurer accepting a premium with an insurance application but

disavowing any coverage until the application is accepted and noting that "by a device calculated to deceive, the applicant is defrauded out of so much of the premium paid as would provide insurance for the period between the application and the acceptance and delivery of the policy").

Thus, Mr. Kimmel was on notice of the sixty-day period from three clauses in two separate documents, and he had "no reasonable expectation" that the policy would be issued after the sixty-day period. While Mrs. Kimmel suggests that Mr. Kimmel had only "constructive" notice of termination of coverage, Mr. Kimmel had *actual* notice based on the express language of the Conditional Receipt. Mr. and Mrs. Kimmel were not misled or deceived as to the exact status of the Application sixty days after it was submitted given the absence of any action by Western Reserve. In fact, under the standard articulated in *Kaiser*, Mr. Kimmel was "so notified" during his lifetime of the termination of coverage under the Conditional Receipt because he had actual notice of the termination language in the receipt and because the sixty days expired prior to his death. *Kaiser*, 339 N.E.2d at 627 ("An insurer cannot terminate the risk so assumed unless the applicant is *so notified* in his lifetime.") (emphasis added).

Mrs. Kimmel's interpretation of *Kaiser* and *Monumental*–that coverage exists under the Conditional Receipt until the insurer denies the application and refunds the premium–is synonymous with that of the plaintiff in *Hornaday*, in which the court reasoned that such an interpretation "would effectively mean that once a conditional receipt is executed insurance coverage is in effect Ad infinitum, regardless of the amount of the consideration tendered, unless notice of termination is given and the consideration returned." *Hornaday*, 597 F.2d at 94. This Court agrees that such an interpretation would be untenable. If the applicant were permitted to pay consideration in the form of an initial premium with the application for the period of the conditional receipt but the term of

the receipt were deemed infinite, the applicant would receive the benefit of continued coverage past the expiration of the receipt without paying additional consideration for that benefit; at the same time, the insurer would assume the risk of the extended coverage without consideration in the form of an additional premium payment. *See id.*

In attempting to distinguish *Barr*, Mrs. Kimmel argues that, because no premium was actually paid when the application for insurance was made in *Barr*, the question of whether the insurer had a duty to refund the payment in order to terminate the temporary coverage was not at issue in *Barr* as it was in *Kaiser* and *Monumental*. Although true that the insurer declined to take the initial payment tendered by the applicant, the Indiana Supreme Court in *Barr* was not considering a case in which the loss occurred prior to the expiration of the conditional receipt, as in *Kaiser* and *Monumental*, but simply whether the receipt expired on its own terms when the loss occurred beyond the effective period of the receipt. The court noted that "there does not seem to have been any contract of insurance concluded between the parties, except that contained in the written agreement above specified, which expired before the loss occurred." *Barr*, 61 Ind. at 488. Similarly, in this case, there was no contract of insurance between Mr. Kimmel and Western Reserve except for the Conditional Receipt, which expired prior to Mr. Kimmel's death.

In *Barr*, the court reasoned:

> By the written contract, the company assumed the risk for the period of thirty days, unless the applicant was sooner notified of its rejection; hence, the company might have been bound, if the loss had occurred within the period mentioned. But it was stipulated in the contract, that, "if the applicant receives no notice that the risk is rejected, the insurance will cease at the end of said thirty days, unless a regular policy has been issued."

*Id*. The court explained that, by its silence, the insurer was bound during the thirty days, but that at its expiration, "by the terms of the contract," the plaintiffs knew that the insurer was no longer

bound and they could have sought insurance elsewhere if they so desired. *Id*. Likewise, Western Reserve assumed the risk for the period of sixty days unless Mr. Kimmel was notified sooner of its rejection, and Western Reserve may have been liable for benefits if Mr. Kimmel had died within the sixty-day period prior to any rejection; however, the express language of the Conditional Receipt provided for the termination of temporary coverage at the expiration of the sixty days, and Mr. Kimmel could have sought insurance elsewhere if he so desired.

Another facet of Mrs. Kimmel's argument is that Mr. Kimmel did not make any other such application for insurance because Western Reserve's delay in processing the Application was unreasonable and Mr. Kimmel relied on Western Reserve's continued investigation of his Application beyond the sixty-day period. There is no language in the contract binding Western Reserve to a certain period of time to process the Application. By the express terms of the Conditional Receipt, any ongoing investigation did not create coverage beyond January 12, 2007, nor did it waive Western Reserve's right to rely on the termination at the expiration of the sixty-day period.

The holding in *Hornaday* on this issue, notwithstanding factual differences between the cases, is persuasive. As in this case, in *Hornaday*, an application for life insurance was made, a premium was paid, and a conditional receipt with a term of sixty days was issued. In contrast, the application in *Hornaday* was approved, a life insurance policy issued, and the insurer repeatedly attempted to deliver the policy and collect a premium from the applicant. The applicant died before the policy was delivered or any premium was paid on the policy, and, at the time of his death, the conditional receipt had expired. The Seventh Circuit found that the insurer did not waive the expiration date of the conditional receipt by approving the application, issuing an insurance policy,

and attempting to deliver the policy and collect the premium. Because the applicant died after the expiration of the receipt but before signing the policy or paying the premium, the court found no coverage. 597 F.2d at 94.[2] Thus, it follows in this case that, if acceptance of the application and issuance of a policy did not extend the conditional period, the mere continued investigation by Western Reserve after the sixty-day period did not extend coverage under the Conditional Receipt.

That Western Reserve did not refund the premium prior to the expiration of the sixty-day period also does not change the express language of the contract. However, the Court is not persuaded by Western Reserve's argument, based on *Hornaday*, that a basis for denying coverage beyond the sixty-day period was Mr. Kimmel's failure to submit any additional premium. The circumstances in *Hornaday* were such that the insurer was seeking payment of the premium on the newly issued policy from the insured. In this case, there was no request by Western Reserve for Mr. Kimmel to pay an additional premium, and Western Reserve had neither issued a policy of insurance nor offered a contractual extension of the Conditional Receipt. There is no clause in the Conditional Receipt providing for an extension of temporary coverage upon the payment of an additional premium. What amount of additional premium would Western Reserve suggest Mr. Kimmel should have paid and on what basis? The operative fact is that the Conditional Receipt for which Mr. Kimmel paid valuable consideration expired on its own terms after sixty days.

---

[2] "Had the actual policy been issued after the expiration of the conditional receipt coverage would be reinstated on that date. There would be no waiver of the terms of the conditional receipt by an agent's attempt to issue a policy after the expiration of the conditional receipt." *Hornaday v. Sun Life Ins. Co. of Am.*, 597 F.2d 90, 94 (7th Cir. 1979).

Thus, the Court finds that the Conditional Receipt expired by its own terms on January 12, 2007, and Western Reserve is not liable to Mrs. Kimmel for death benefits under the Conditional Receipt.[3]

As an alternative basis for summary judgment on the claim for death benefits, Western Reserve argues that Mr. Kimmel failed to give truthful answers regarding his medical history, failed to accurately and completely disclose the conditions revealed on his Application, and failed to disclose the extent of his other medical conditions and the requested details surrounding those conditions, in violation of the terms of the Conditional Receipt, rendering the Conditional Receipt void *ab initio*.[4]  Similarly, Western Reserve argues that Mr. Kimmel's omissions and misrepresentations were material to Western Reserves determination of coverage, and, thus, the material misrepresentations render any coverage void under the terms of the Conditional Receipt as a matter of law.  Not surprisingly, Mrs. Kimmel strongly opposes Western Reserve's characterization of the alleged misrepresentations and further contests whether any alleged misrepresentations were in fact material to Western Reserve's coverage determination.  Both parties have offered extensive argument and evidence in the form of affidavits and documentation in

---

[3] Courts in other jurisdictions have also found no coverage under a binder for a loss incurred after the expiration of a conditional receipt. *See, e.g., Marchel v. Georgia Mut. Ins. Co.*, 373 S.E.2d 787, 789 (Ga. Ct. App. 1988) (denying coverage under a temporary binder for automobile insurance when the loss occurred after the binder expired); *Maldonado v. First Nat'l Life Ins. Co.*, 443 P.2d 744, 746 (N.M. 1968) (holding that there was no contract of insurance when the receipt provided that no offer of insurance within sixty days would be deemed a declination and the sixty days had passed prior to the loss, explaining that "the overwhelming weight of authority is to the effect that no inference or presumption of acceptance is to be drawn from mere delay in passing on the application").

[4] Under *Kaiser* and *Monumental*, any conditions to coverage in a conditional receipt constitute conditions subsequent to coverage if the applicant dies prior to the insurer denying coverage and returning the premium. *See Monumental Life Ins. Co. v. Hakey*, 354 N.E.2d 333, 334 (Ind. App. 1976); *Kaiser v. Nat'l Farmers Union Life Ins. Co.*, 339 N.E.2d 599, 627 (Ind. App. 1976).  Subsequently, in *Primerica*, the Indiana Court of Appeals articulated the exception that *material* misrepresentations on an application render coverage void. *Primerica Life Ins. Co. v. Skinner*, 678 N.E.2d 1140, 1142-43 (Ind. Ct. App. 1997).

support of their positions. Western Reserve has offered the report of an expert, and Mrs. Kimmel has countered with an affidavit from Mr. Kimmel's treating physician.

As noted earlier, a material misrepresentation on an application for life insurance will void any coverage under the terms of a conditional receipt. *Primerica*, 678 N.E.2d at 1142-43; *see also Foster v. Auto-Owners Ins., Co.*, 703 N.E.2d 657, 659 (Ind. 1998) (recognizing that a material misrepresentation or omission of fact in an insurance application, relied on by the insurer in issuing a policy, renders the coverage voidable at the insurance company's option). "A representation is material if the fact omitted or misstated, if truly stated, might reasonably influence the insurer's decision whether to issue the policy or to charge a higher premium." *Curtis*, 610 N.E.2d at 874. Whether a misrepresentation is "material is a question for the jury, unless the evidence is such that there can be no reasonable difference of opinion." *Prudential Ins. Co. of Am. v. Winans*, 325 N.E.2d 204, 206 (Ind. 1975).

Because the Court finds that the Conditional Receipt expired on its own terms and Western Reserve is not liable to Mrs. Kimmel for death benefits under the Conditional Receipt, it is unnecessary for either the Court, as a matter or law, or a jury, on a question of material fact, to determine whether Mr. Kimmel made misrepresentations, and if so, whether the misrepresentations were material to Western Reserve's decision. If the Court or jury were to determine that Mr. Kimmel made material misrepresentations on the Application, then the Conditional Receipt may be void, and Western Reserve would not be liable. If the Court or jury were to determine that Mr. Kimmel did not make material misrepresentations on the Application, then the Conditional Receipt would not be void, but it would have nevertheless expired on its own terms, and Western Reserve would not be liable.

Finally, the Court turns to Count III of Mrs. Kimmel's Complaint, in which she seeks compensatory damages for Western Reserve's alleged breach of the duty of good faith and fair dealing. Although it appears that Mrs. Kimmel has dropped this claim in her reply brief, in the interests of thoroughness, the Court nevertheless considers the two-part claim. First, Mrs. Kimmel alleges that Western Reserve's failure to accept or deny the Application within the three months prior to Mr. Kimmel's death and the additional five months after Mr. Kimmel's death it took to issue the denial letter were each an "undue and unreasonable delay." Second, Mrs. Kimmel alleges that the reasons for denial set forth in the July 23, 2007 denial letter are "pretextual and based on false allegations" constituting a wrongful and intentional effort in bad faith to avoid payment due to Mrs. Kimmel.

On the first basis, Indiana has not adopted a doctrine of tort liability by insurance companies for an unreasonable delay in the acceptance or rejection of an application for insurance or in the failure to deliver an insurance policy for acceptance or rejection by the applicant within a reasonable time. *Metro. Life Ins. Co. v. Brady*, 174 N.E. 99, 102 (Ind. App. 1930) (citing *Live Stock Ins. Ass'n of Huntington, Wabash and Whitley Counties v. Stickler*, 115 N.E. 691, 694 (Ind. App. 1917)).[5] The court reasoned that such tort liability cannot be imposed on an insurance company in the absence

_____

[5] Mrs. Kimmel relies on *Live Stock Ins. Ass'n of Huntington, Wabash and Whitley Counties v. Stickler*, 115 N.E. 691 (Ind. App. 1917), for her assertion that Indiana recognizes a cause of action against an insurer for negligent or unreasonable delay in acting on an application for insurance. First, the Court in *Brady* opined that the court in *Stickler* did not, without qualification, approve the asserted doctrine of tort liability. *Metro. Life Ins. Co. v. Brady* 174 N.E. 99, 102 (Ind. App. 1930). Second, the holding in *Stickler* actually supports a finding of no coverage on the date of Mr. Kimmel's death given that Western Reserve had not yet acted on the Application and had not yet refunded his premium. In *Stickler*, the court recognized that "an application for insurance constitutes merely a proposition to obtain insurance, and does not become a contract binding on the parties until accepted by the insurance company." 115 N.E. at 692. On the facts of that case, the court found that "[i]nformation from the company that the application had not been rejected, and knowledge that the premium was retained . . . fall short of showing approval of the application . . . or an estoppel of [insurance company] to deny such approval." *Id.* at 693.

of a legal duty to either accept or reject an application within a reasonable time. *Id*. The court found that the "legal duty must arise by virtue of some express provision of the statute or from the contractual relation existing between the parties whereby a legal duty, not a moral duty, devolves upon the insurance company to act within a reasonable time upon an application submitted." *Id*. The court also recognized the well-settled rule that "mere delay in passing upon an application for life insurance cannot be construed as an acceptance thereof by the insurer which will support an action ex contractu." *Id*. at 103 (citing cases). As in *Brady*, this Court gives effect to the terms of the contract between the parties–the Conditional Receipt, and finds that there are no conditions in the contract requiring Western Reserve to accept or reject the Application within a specific period of time. The language of the Conditional Receipt provided that if Western Reserve did not accept or deny the Application within sixty days, coverage would terminate. In addition, Mrs. Kimmel has not identified any Indiana statute imposing such a legal duty on insurance companies. Thus, because Western Reserve had no legal duty to act upon the Application within a given period of time, no tort liability can be imposed.

On the second basis, the Indiana Supreme Court has recognized a duty of good faith and fair dealing owed by an insurance company to its insured. *See Erie Ins. Co. v. Hickman*, 622 N.E.2d 515-19 (Ind. 1994). The "obligation of good faith and fair dealing includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of his claim." *Masonic Temple Assoc. of Crawfordsville v. Indiana Farmers Mut. Ins. Co.*, 779 N.E.2d 21, 26 (Ind. Ct. App. 2002), *trans. denied* (citing *Erie*, 622 N.E.2d at 519). However, a cause of action does not lie every time a claim is denied, and an insurer may dispute a

claim in good faith. *See Hopper v. Carey*, 810 N.E.2d 761, 766 (Ind. Ct. App. 2004), *trans. denied*; *Masonic Temple*, 779 N.E.2d at 26. "To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability." *Masonic Temple*, 779 N.E.2d at 26. Recently, Indiana courts have stated that "[p]oor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present. A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will. A bad faith determination inherently includes an element of culpability." *Lumbermens Mut. Cas. Co. v. Combs*, 873 N.E.2d 692, 714 (Ind. Ct. App. 2007) (quoting *State Farm Mut. Auto. Ins. Co. v. Gutierrez*, 844 N.E.2d 572, 580 (Ind. Ct. App. 2006)).

The Court finds that Mrs. Kimmel has not raised a genuine issue of material fact that Western Reserve "had knowledge that there was no legitimate basis for denying liability" sufficient to avoid summary judgment. After an investigation of Mr. Kimmel's extensive medical records through Broyles, a third party, Western Reserve denied Mrs. Kimmel's claim for benefits on the basis that Mr. Kimmel's medical history made him uninsurable with Western Reserve because of alcohol abuse, depression, and anger, and Western Reserve detailed the bases for these findings in its letter. Western Reserve also reserved any other rights or defenses that it may have with regard to a claim under the Application.

In support of its Motion for Summary Judgment, Western Reserve offers the affidavits of both Mr. Lovejoy and its expert Dr. Fitzgerald to demonstrate that Western Reserve did not unreasonably withhold life insurance benefits and that it had proper cause and a rational basis for denying Mrs. Kimmel's claim. Dr. Fitzgerald opined that Western Reserve did not unreasonably

withhold life insurance policy benefits without proper cause, had a rational basis for denying Mrs. Kimmel's claim, and did not exhibit any dishonest purpose, moral obliquity, furtive design, or ill will in handling Mrs. Kimmel's claim. Mr. Lovejoy testified that, if Western Reserve had been advised of the severity of Mr. Kimmel's medical history and complications, coverage would not have been approved on any basis and that he was not insurable with Western Reserve.

In her combined brief in support of her motion and in response to Western Reserve's, Mrs. Kimmel argues that, although an insurer may properly rely on information contained in the insured's medical records to evaluate a claim, *see Hickman*, 622 N.E.2d at 520, in this case, Western Reserve expressly misrepresented those records. In support, Mrs. Kimmel identifies three alleged errors in Dr. Fitzgerald's report. First, Mrs. Kimmel accurately notes that Dr. Fitzgerald misidentifies the notation of a statement by Mr. Kimmel to Dr. Nasr of almost hitting someone while driving as a diagnosis of "road rage" by Dr. Nasr, which Dr. Fitzgerald then linked to a failure to disclose anger issues, when in fact Mr. Kimmel was reporting fatigue while driving. Although Dr. Fitzgerald did err in this interpretation of the record, it is one error in the whole of his report, and there is no evidence that Dr. Fitzgerald purposefully mischaracterized the evidence, that Western Reserve induced him to do so, or that Western Reserve was aware of the error.

Second, Mrs. Kimmel contests Dr. Fitzgerald's representation that Mr. Kimmel was hospitalized on September 29, 2006, for "bipolar" as stated in Exhibit 2 to his report: "9/29/06 Porter Memorial Hospital – Fatigue, Polyarthralgia, Bipolar Disorder." In support, Mrs. Kimmel offers the testimony of Dr. Nasr that "this is incorrect." Even viewing this contested fact in the light most favorable to Mrs. Kimmel, it is not clear how this minor error adversely affected Dr. Fitzgerald's assessment of the extent of Mr. Kimmel's bipolar illness, given the extensive evidence of the illness'

existence, treatment, and duration. Again, there is no evidence that Dr. Fitzgerald purposefully mischaracterized this evidence, that Western Reserve induced him to do so, or that Western Reserve was aware of the error.

Finally, Mrs. Kimmel asserts that Dr. Fitzgerald misidentifies depression, anger, and alcohol use as independent conditions rather than phases of Mr. Kimmel's bipolar illness and that Western Reserve's reliance on these conditions is evidence of pretext. Mrs. Kimmel maintains throughout her brief, with the support of Dr. Nasr's testimony, that Mr. Kimmel's depression was a phase of his bipolar condition, not a separate illness, and that his symptoms of anger and the "short term" use of alcohol were symptoms of his bipolar illness. Mrs. Kimmel relies heavily on Dr. Nasr's explanation of Mr. Kimmel's medical history; however, there is no evidence or even argument that, had Western Reserve consulted with Dr. Nasr (which Mrs. Kimmel does not argue Western Reserve was required to do), his explanation would have changed Dr. Fitzgerald's conclusions or Western Reserve's assessment of whether Mr. Kimmel was insurable. With the exception of the two errors noted above, Dr. Fitzgerald's identification of the Mr. Kimmel's symptoms and treatment appears otherwise accurate, and Mrs. Kimmel has offered no evidence that Western Reserve did not truly and reasonably believe that the extent of Mr. Kimmel's illnesses made him uninsurable.

From the evidence of record, there is no basis to infer that Western Reserve intentionally misrepresented Mr. Kimmel's records as a pretext to deny the claim for death benefits or establish with "clear and convincing evidence" that Western Reserve "had knowledge that there was no legitimate basis for denying liability." *Masonic Temple*, 779 N.E.2d at 26. In other words, Mrs. Kimmel has not met her burden of raising a genuine issue of material fact that Western Reserve had knowledge that there was no legitimate basis for denying liability.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES in part** and **DENIES as moot in part** the Motion of Defendant, Western Reserve Life Assurance Company of Ohio, to Strike Affidavit of Newcomb [DE 33]; **GRANTS** the Motion for Summary Judgment of Defendant Western Reserve Life Assurance Company of Ohio [DE 19]; and **DENIES** the Cross Motion for Partial Summary Judgment [DE 26]. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant Western Reserve Life Assurance Company of Ohio and against Plaintiff June L. Kimmel, Individually, and as Personal Representative of the Estate of Richard Kimmel.

So ORDERED this 14th day of January, 2010.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record